# EXHIBIT F-9

THE ADMINISTRATIVE SERVICE CONTRACT BETWEEN BLUE CROSS BLUE SHIELD AND L&W ENGINEERING COMPANY AND THE L&W ENGINEERING COMPANY HEALTH CARE PLAN, DATED MAY 10, 2005

---

**Administrative Services Contract - Weekly Call-In Program**

**Between Blue Cross Blue Shield of Michigan And**

**L & W Engineering Company and The L & W Engineering Company  Health Care Plan**

---

This Contract is effective on May 1, 2005 and is made between Blue Cross Blue Shield of Michigan, a Michigan non-profit health care corporation, with offices at 600 Lafayette East, Detroit, Michigan 48226-2998, and L & W Engineering Company (Group), as the plan sponsor and administrator of The L & W Engineering Company Health Care Plan with offices at 6301 Haggerty Road, Belleville, MI 48111.

BCBSM and Group have agreed that BCBSM shall administer Claims processing for Group's Health Care Plan. This Contract sets forth the administrative responsibilities of BCBSM and other BCBS Plans, and Group's financial responsibilities with respect to the administration of the Health Care Plan.

BCBSM and Group agree as follows:

### ARTICLE I
### DEFINITIONS

A. "**Amounts Billed**" means the amount that Group shall reimburse and pay BCBSM for Claims which have been processed and paid by BCBSM or another BCBS Plan.

B. "**BCBS Plan**" means a company that has been licensed by BCBSA.

C. "**BCBSA**" means the Blue Cross Blue Shield Association.

D. "**BCBSM**" means Blue Cross Blue Shield of Michigan.

E. "**BlueCard Program**" means the national program established by BCBSA under which Enrollee Claims are processed by BCBS Plans when Enrollees receive health care services outside of the geographic area that BCBSM serves. BCBSA mandates the policies, procedures and disclosures of the BlueCard Program and amends them from time to time. Schedule D sets forth BCBSA's required disclosures for the BlueCard Program and is incorporated into this Contract. If BCBSA amends the disclosures, such amendments shall automatically become a part of this Contract upon BCBSM giving 60 days prior written notice to Group.

F. "**Claim**" means a request for payment for a health care service provided to an Enrollee, with an incurred date for the service during the term of this Contract.

G. "**Contract Year**" means the period from the Effective Date to the first Renewal Date, or the period from one Renewal Date to the next Renewal Date. If termination occurs other than at the end of a Contract Year, Contract Year means that period from the Effective Date or the most recent Renewal Date through the date of termination.

H. "**Coverages**" means the health care benefits described in the Universal Group Application signed by BCBSM and the Group, which is incorporated into this Contract.

1



DEPOSITION EXHIBIT

Al Ross

JLR 4-15-10

PENGAD 800-631-6989

I. **"Custom BlueCard Plan"** means a BCBS Plan that has a financial arrangement with BCBSM whereby such BCBS Plan has waived BlueCard access fees.

J. **"Effective Date"** means May 1, 2005.

K. **"Employee"** means the following who are eligible and enrolled for Coverage: (i) employees as designated by the Group, (ii) if applicable, retirees and their surviving spouses as designated by the Group; and (iii) COBRA beneficiaries.

L. **"Enrollee"** means an individual that is enrolled in Group's Health Care Plan, either as an Employee or as a dependent of an Employee.

M. **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, 29 USC 1101, *et seq*, and regulations promulgated thereunder.

N. **"Health Care Plan"** means The L & W Engineering Company Health Care Plan.

O. **"HIPAA"** means the Health Insurance Portability and Accountability Act of 1996, as amended, Public Law 104-191 of 1996, *et seq*, and regulations promulgated thereunder.

P. **"IBNR Claim"** means an Enrollee Claim that is incurred during the term of this Contract but has not been reported to the Group.

Q. **"Participating Plan"** means a BCBS Plan that has contracted with BCBSM to allow Enrollees access to its health care providers and services, and processes Enrollee Claims using the National Account Service Company (NASCO) system.

R. **"Renewal Date"** means the date one year after the Effective Date, and the same date of every subsequent year. The Renewal Date may be changed by mutual agreement of BCBSM and Group.

S. **"Subsidiary Company"** means an entity that is a subsidiary, division, affiliate, limited liability company, partner or joint venture of Group. This shall include companies which are Subsidiary Companies at the time this Contract is executed, and any such companies later acquired by Group.


## ARTICLE II
## GENERAL RESPONSIBILITIES

A. **ERISA Standards.**

If Group's Health Care Plan is subject to ERISA, it is understood and agreed that neither BCBSM nor any other BCBS Plan is the plan administrator or the plan sponsor as those terms are defined under ERISA. To the extent that Group has delegated to BCBSM the responsibility and discretionary authority to provide a full and fair review of a denied Claim, BCBSM agrees only to be the named fiduciary of the decision denying the Claim as contemplated by 29 USC 1133. Any determination or interpretation made by BCBSM pursuant to this discretionary authority is binding on the Enrollee, Group, and BCBSM unless it is demonstrated that the determination or interpretation was arbitrary and capricious. Group retains all other responsibilities and duties under ERISA not specifically delegated to BCBSM.

2

The responsibilities of BCBSM and each BCBS Plan are limited to providing administrative services for the processing and payment of Claims. BCBSM and other BCBS Plans shall not be responsible for Group's failure to meet any of its financial obligations with respect to Group's Health Care Plan or Enrollee disclosures.

B. **Enrollment.**

Prior to the Effective Date, Group shall notify BCBSM of all Enrollees that will be covered by Group's Health Care Plan. During the term of this Contract, following agreed upon procedures, Group shall notify BCBSM of all changes in Group's Health Care Plan enrollment. Until BCBSM has been properly notified of changes to Group's Health Care Plan enrollment, BCBSM and other BCBS Plans shall continue to process Claims for Enrollees as listed on BCBSM's computer membership programs.

C. **Claims Processing.**

During the term of this Contract, Claims that are directly submitted to BCBSM shall be processed according to BCBSM's standard operating procedures.

Claims that are directly submitted to a Participating Plan shall be processed pursuant to its contract with BCBSM.

Claims that are directly submitted to a BCBS Plan that is not a Participating Plan shall be processed pursuant to the BlueCard Program.

Group acknowledges that BCBS Plans are not obligated to execute a Participating Plan agreement covering Enrollees with BCBSM. Participating Plans and Custom BlueCard Plans serving the Group are stated in Schedule B.

D. **Disputed Claims.**

Group shall notify BCBSM in writing of any Claim that Group disputes within 60 days of Group's receipt of a paid Claims listing. BCBSM shall investigate such Claims and respond to Group within a reasonable time period. Upon BCBSM's request, Group shall execute any necessary documents that will allow BCBSM to recover any amounts that may be owed by a third party with respect to such disputed Claim. If BCBSM recovers any amount from a third party or if BCBSM determines that the disputed Claim is not Group's liability or is incorrect, then BCBSM shall give Group a credit for the recovered or corrected amount (reduced by any Stoploss credits given by BCBSM relating to such disputed Claim) on a subsequent invoice.

E. **Subrogation.**

BCBSM shall be subrogated to all of Group's or an Enrollee's rights with respect to any Claim, however, BCBSM is not obligated to institute or become involved in any litigation concerning such Claim.

F. **Litigation.**

If a third party initiates a claim, suit, or proceeding against the Plan, Group, or BCBSM relating to benefits payable under the Plan or any of the administrative services subject to this Contract ("Litigation"):

1.  Each party shall provide prompt written notice of the Litigation to the other party if served with such Litigation.

2. After consultation between Group and BCBSM, if Group determines that the Litigation does not involve state tax issues, mandated benefit issues or the Litigation does not threaten to have a material adverse impact on Plan costs or administration, BCBSM shall select counsel and defend the litigation.

3. After consultation between Group and BCBSM, if Group determines that the Litigation involves state tax issues, mandated benefit issues or the Litigation threatens to have a material adverse impact on future Plan costs or administration, Group shall select counsel to defend the litigation and timely notify BCBSM of its selection.

4. Whenever Group or BCBSM is a party in any Litigation, regardless of who is obligated to defend the litigation, Group and BCBSM each reserve the right, at its own cost and expense, to retain counsel to protect its own interests.

5. Regardless of who is obligated to defend the litigation, Group and BCBSM shall fully cooperate with each other to provide all relevant information and documents within their respective control that are not subject to a privilege or confidentiality obligation; and to reasonably assist each other to defend, settle, compromise, or otherwise resolve the Litigation. Whenever either party is served with any Litigation, the party served shall take all steps necessary to prevent a default in the Litigation prior to determining which party will defend such Litigation.

6. When BCBSM is obligated to defend the Litigation, BCBSM shall have full authority to settle or compromise such Litigation, without Group's consent, unless:

   a. $50,000 or more is at issue in the Litigation;
   b. State tax issues or mandated benefit issues are part of the Litigation and Group has requested BCBSM to defend the Litigation;
   c. Settlement of the litigation could have a material adverse impact on future Plan costs or administration.

   If Group's consent is required, such consent shall not be unreasonably withheld. If Group withholds consent for any reason and the final resolution of the Litigation is equal to or greater than a settlement or compromise proposed by BCBSM, Group shall pay the additional cost of any subsequent settlement, compromise or judgment including all of BCBSM's reasonable attorney fees and costs for proceeding with the Litigation.

7. When Group is obligated to defend the Litigation, Group shall have full authority to settle or compromise such Litigation without BCBSM's consent, unless BCBSM has notified Group that the Litigation may have a material adverse impact on BCBSM.

   If BCBSM's consent is required, such consent shall not be unreasonably withheld. If BCBSM withholds consent for any reason and the final resolution of the Litigation is equal to or greater than a settlement or compromise proposed by Group, BCBSM shall pay the additional cost of any subsequent settlement, compromise or judgment including all of Group's reasonable attorney fees and costs for proceeding with the Litigation.

8.  Subject to paragraph 6 above, when BCBSM is obligated to defend the Litigation, the cost and expenses of such defense shall be paid by BCBSM. The cost and expenses of such defense shall include reasonable attorney fees and other reasonable litigation costs, however, any settlement or payment for benefits or Claims shall be paid by Group.

9.  Subject to paragraph 7 above, when Group is obligated to defend the Litigation, the cost and expenses of such defense shall be paid by Group. The cost and expenses of such defense shall include reasonable attorney fees and other reasonable litigation costs and any settlement or payment for benefits or Claims shall be paid by Group.

10. Class Action Lawsuit – If either party has formal notice of any class action lawsuit involving the Plan, such party shall promptly notify the other party.

## G. Group Audits.

The Group, at its own expense, shall have the right to audit Claims incurred under this Contract; however, audits shall not occur more frequently than once every twelve months and shall not include Claims from previously audited periods or Claims paid prior to the last 24 months. Both parties acknowledge that Claims with incurred dates over two years old may be more costly to retrieve and that it may not be possible to recover over-payments for these Claims; however, BCBSM shall use best efforts to retrieve such Claims.

All audits shall be conducted pursuant to BCBSM corporate policy and other requirements at the time of the audit. The parties acknowledge staffing constraints may exist in servicing concurrent Group initiated audits. Therefore after notice from the Group requesting an audit, BCBSM will have 60 to 90 days, depending on scope and sample size, to begin gathering requested documentation and to schedule the on-site phase of the audit.

Sample sizes shall not exceed 200 Claims and shall be selected to meet standard statistical requirements (i.e., 95% Confidence Level; precision of +/- 3%). The Group shall reimburse BCBSM for Claims documentation in excess of 200 Claims at $20 per randomly selected claim and $50 per focused or electronically selected Claim. However, reimbursement shall be waived for any agreed-upon Claims.

Following the on-site activity and prior to disclosing the audit findings to the Group, the Auditor shall meet with BCBSM Management and present the audit findings. BCBSM, depending upon the scope of the audit, shall be given a reasonable period of time to respond to the findings and provide additional documentation to the Auditor before the Auditor discloses the audit findings to the Group.

BCBSM shall have no obligation to make any payments to the Group unless there has been a recovery from the provider, Enrollee, or third-party carrier as applicable. No adjustments or refunds shall be made on the basis of the auditor's statistical projections of sampled dollar errors. An audit error will not be assessed if the Claim payment is consistent with BCBSM policies and procedures, or consistent with specific provisions contained in this Contract or other written Group instructions agreed to by BCBSM.

Prior to any audit, the Group and BCBSM must mutually agree upon any independent third party auditor that the Group wishes to perform the audit. Additionally, prior to

audit, the Group and any third party auditor shall sign all documents BCBSM believes necessary for the audit which will, at a minimum, provide for: the scope of the audit; the costs for which BCBSM is to be reimbursed by the Group; the protection of confidential and proprietary information belonging to BCBSM, and of any patient specific information; and the indemnification and hold harmless of BCBSM from any Claims, actions, demands or loss, including all expenses and reasonable attorney fees, arising from any suit or other action brought by an individual or provider to the extent caused by the Group and/or its auditor.

**H.     Disclosures.**

Group shall disclose the following to Enrollees:

1.    BCBSM services being provided.
2.    BCBSM does not insure any Enrollees.
3.    Group is responsible for the payment of Claims.
4.    Group is responsible for changes in benefits.

**I.     Health Care Provider Interest.**

Group acknowledges that various states have enacted prompt payment legislation with respect to the payment of Claims, and BCBSM or other BCBS Plans may have provider contracts that require the payment of interest on Claims in certain situations. If BCBSM invoices Group for interest required by statute or provider contracts, Group shall pay such interest.

**J.     Confidentiality.**

The terms of this Contract and the items set forth below are confidential and shall not be disclosed or released to a third party without the prior written consent of BCBSM.

1.    Claim Information
Enrollee personal or individually identifiable health information.

2.    Provider Proprietary Information
Health care provider names, addresses, tax identification numbers, and financial amounts paid to such providers.

3.    BCBSM and Other BCBS Plan Proprietary Information
BCBSM's or any other BCBS Plan's methods of reimbursement, amounts of payments, discounts and access fees; BCBSM's administrative fees and, if applicable, stoploss fees; those processes, methods, and systems developed for collecting, organizing, maintaining, relating, processing and transacting comprehensive membership, provider reimbursement and health care utilization data.

**K.     Health Care Provider Discounts.**

1.    BCBSM shall pass through in Amounts Billed any health care provider discounts (at the time the Claim is incurred) that BCBSM receives from its contracted providers, or from any BCBS Plan that has an arrangement with its health care providers where such providers are reimbursed an amount less than charges.

6

2. Group acknowledges that health care provider discounts may be different than BCBSM's estimates as set forth in Schedule B due to (but not by way of limitation) provider participation, demographics, utilization, access, settlements or the Claim pricing methodology of a BCBS Plan. BCBSM shall not be responsible for any difference between the estimated health care provider discounts as set forth in Schedule B and the actual discounts realized and passed through in Amounts Billed.

3. Some BCBS Plans will process and submit Claims to BCBSM through the BlueCard Program. Amounts Billed for Claims processed through the BlueCard Program shall be calculated according to the BlueCard Program policies and procedures, as noted in Schedule D.

L.  **Coordination with Medicare.**

Group shall timely notify BCBSM whether Medicare is the primary payer for Claims of any Enrollee. BCBSM shall change such Enrollee's eligibility record within 15 business days of BCBSM's receipt of Group's notice. Group shall indemnify and hold harmless BCBSM for any claim, demand, judgment, penalty or other liability that arises out of Group's failure to provide timely notice to BCBSM. BCBSM shall indemnify Group for any claim, demand, judgment, penalty or other liability that arises out of BCBSM's failure to make the necessary change to such Enrollee's eligibility record as provided above.

M.  **Certificate of Creditable Coverage.**

Group shall notify BCBSM of any individual that is no longer covered by the Health Care Plan and BCBSM shall then issue a certificate of creditable coverage to such individual. However, Group shall retain responsibility for issuing certificates of creditable coverage to individuals entitled to elect COBRA no later than when the Group provides the COBRA notice.

### ARTICLE III
### FINANCIAL RESPONSIBILITIES

A.  **Group Responsibilities.**

Group shall be liable for all Amounts Billed for Claims submitted by Enrollees which Group has enrolled under the provisions of Article II (B). Group shall be liable for all risks, financial obligations, including but not limited to Amounts Billed and any court costs and attorney's fees awarded by a court to Enrollees; and all other liabilities which BCBSM may assume or which might otherwise attach with respect to administration of Coverages pursuant to this Contract. The Group shall make full payment and satisfaction to BCBSM for all amounts resulting from such risks, financial obligations, and liabilities.

B.  **Amounts Payable by Group.**

Group shall pay BCBSM the following amounts:

1. Amounts Billed

2. Michigan hospital advance as set forth on Schedule A, to be amended from time to time
3. BCBSM's administrative fees as set forth on Schedule A, to be amended from time to time
4. Late fees, if any
5. Statutory or contractual interest, if any
6. Stoploss premiums, if applicable, as set forth on Schedule A, to be amended from time to time
7. Any other amounts which are Group's responsibility pursuant to this Contract, including but not limited to risks, obligations or liabilities, deficit amounts relating to previous agreements, and deficit amounts relating to settlements.

C. **Schedule A Renewals.**

Sixty days prior to the first year Renewal Date and 120 days prior thereafter, BCBSM shall send Group a Schedule A for the new Contract Year with BCBSM's new administrative fee, stoploss fees if applicable and stoploss attachment points if applicable, and new Michigan Hospital advance. Group shall execute the renewal term Schedule A before the Renewal Date.

D. **BCBSM's Weekly Invoice.**

The Amounts Billed and any adjustments shall be set forth on a weekly invoice that will be sent electronically to Group. BCBSM's administrative fees and Stoploss premiums if applicable shall be invoiced each month. BCBSM shall provide Group with a monthly Claim listing.

E. **Group's Weekly Wire Payments.**

Group shall make weekly wire transfer payments of all amounts due to BCBSM within one business day of the date that Group was notified of the amounts due. If Group's payment is more than one business day late, Group shall pay a late fee of two percent of any outstanding amount due. In addition, BCBSM may cease to process Claims retroactive to the last date for which full payment was made.

F. **Settlements.**

Approximately 180 days after the end of each Contract Year, BCBSM shall provide an annual settlement of the actual administrative fee and any other amounts owed. BCBSM shall use its enrollment records for the Contract Year at the time the settlement is calculated. Group shall pay any underpayments to BCBSM within 15 days of BCBSM's invoice therefor. BCBSM shall pay any overpayments to Group within 15 days of the settlement.

G. **Changes in Enrollment or Coverages.**

1. If there is more than a 10 percent change in the number of Employees from the number stated in Schedule A during any month of the Contract Year or a change in Coverages, BCBSM's monthly administrative fee may be revised by BCBSM. Any revisions to the administrative fees shall be effective beginning with the first month following 30 day notification by BCBSM to Group.

2. If there is more than a 10 percent decrease in the number of Employees enrolled from the largest number of Employees ever enrolled at the same time, BCBSM may collect from Group three months of administrative fee at the current rate times the

8

net decrease in Employee count from the highest level. If the enrolled Employee count subsequently increases to a level 5 percent below the highest level, BCBSM shall return to Group the administrative fee collected under this provision.

3. In the event a Participating Plan ceases using the NASCO system to process Enrollee Claims, or a Custom BlueCard Plan terminates its Custom BlueCard financial arrangement with BCBSM, BCBSM may revise the monthly administrative fee. Any revisions to the administrative fee shall be effective beginning with the first month following 30 day notification by BCBSM to Group.

H. **Michigan Hospital Settlement Adjustments.**

Reconciliations of the original and settled hospital reimbursements are made periodically by BCBSM for its participating hospitals. The effect of these reconciliations is to retroactively adjust the amounts paid to hospitals for Claims which have already been billed to Group. BCBSM shall annually derive a total adjustment to Group's Amounts Billed based on hospital reconciliations done in the last year. Depending on whether the total adjustment results in a decrease or increase to Amounts Billed, BCBSM may make either a credit or charge to a special hospital settlement account maintained for Group. After making the annual charge or credit to this account, BCBSM shall determine whether the account balance is positive or negative. If the balance is positive (payable to Group), one half of the balance, net of any applicable Aggregate Stoploss settlement payments and any other amounts owed to BCBSM, plus interest shall be refunded to Group. Only the positive cumulative balance of this special account, if any, shall be included in the final settlement for the last Contract Year in the event of this Contract's termination.

In the event the cumulative balance in this account is negative, such balance shall not be considered as an amount owed by Group; however, any negative balance shall be carried forward and netted against any positive hospital settlements in future years. Interest shall also be debited to the account based on the negative balance. Also, if this Contract is terminated and as part of the settlement for the last Contract Year, any provider refunds or settlements due to Group shall be credited to this account. Such refunds or settlements shall be payable to Group only to the extent that they exceed a negative balance in the hospital settlement account.

## ARTICLE IV
## TERMINATION AND POST TERMINATION

A. **Termination.**

1. With or Without Cause. Either party may with or without cause, upon the first day of the month following 90 days prior written notice, terminate this Contract. If this Contract is terminated according to this subsection, BCBSM and other BCBS Plans shall then continue to process and pay Claims.

2. Nonpayment or Partial Payment. Notwithstanding any other Contract provisions, if Group fails to timely pay any amounts owed, BCBSM may, after five days notice in writing, terminate this Contract. If this Contract is terminated according to this subsection, BCBSM may, in its sole discretion, continue to process and pay Claims, and direct other BCBS Plans to process and pay Claims.

3. Termination within the First Contract Year. If Group terminates the Contract before the end of the first Contract Year, or if BCBSM terminates the Contract for

nonpayment before the end of the first Contract Year, Group shall pay BCBSM twelve months of administrative fees at the rate stated in Schedule A. Group's liability for administrative fees shall be determined using the average monthly enrollment prior to termination, and shall be net of administrative fees paid prior to termination.

B. **Post Termination.**

1. End of Coverage. Notwithstanding any other provisions contained herein, neither BCBSM nor any BCBS Plan shall have any obligation for payment for any health care services which are incurred following termination of this Contract.

2. Obligation to Pay. Notwithstanding any other provisions contained herein, Group's obligation to pay amounts incurred under the Contract shall survive termination, and Group shall continue to timely pay all amounts owed. Because of the arrangements for payment of services between BCBS Plans and their participating health care providers, all Claims shall be processed by BCBSM or other BCBS Plans pursuant to the terms and conditions herein. Group agrees that it shall have no right to have any such Claims processed by a replacement carrier or administrator. BCBSM retains the right to cease paying Claims if Group fails to timely pay BCBSM for Amounts Billed.

3. Claim Payments. For the first three months following the date of termination, BCBSM shall invoice and Group shall make weekly payments for Amounts Billed in the same manner as prior to the date of termination. Thereafter, for the next three months Group shall make monthly payments to BCBSM for Amounts Billed. After six months from the date of termination, BCBSM shall offset any Claim payments against the Michigan hospital advance until the Michigan hospital advance is depleted. If the Michigan hospital advance is depleted, BCBSM shall resume invoicing Group monthly for Amounts Billed. At the end of 24 months after termination, BCBSM shall refund any remaining portion of the Michigan hospital advance to Group. After 24 months from the date of termination, BCBSM shall invoice Group for any Claims paid, and Group shall pay BCBSM the Amounts Billed within 10 days of the date of the invoice.

4. Administrative Fees. Group shall pay BCBSM, by wire transfer, an administrative fee for the first three months after the date of termination in an amount equal to the final month's Employee count times the fee per Employee month in effect for the final month before termination. However, if the Employee count in the final month is less than the Employee count in the month exactly one year earlier, BCBSM shall calculate the post termination administrative fee using the higher count from one year earlier, unless BCBSM collected administrative fees under the provisions of Article III (G)(2) for Employees who terminated coverage in the final year before Contract termination. If there was an Article III (G)(2) charge for Employee terminations occurring in the final year, then the Employee count for calculating administrative fees after Contract termination shall equal the Employee count one year prior to the termination minus the number of Employees terminating in the final year and charged to Group under Article III (G)(2).

5. Settlement-Last Contract Year. Within 180 days following the date of termination, BCBSM shall prepare a settlement statement for the last Contract Year. Such settlement statement shall include, if applicable, Stoploss premiums, aggregate Stoploss attachment point calculations, and administrative fees including post termination administrative fees.

10

## ARTICLE V
## GENERAL PROVISIONS

A.    **Entire Agreement.**

This Contract includes and incorporates any Schedules, Addenda, Exhibits, and Amendments and represents the entire understanding and agreement of the parties regarding matters contained herein. This Contract supersedes any prior verbal or written agreements and understandings between the parties and shall be binding upon the parties, their successors or assigns.

B.    **Service Mark Licensee Status.**

BCBSM is an independent licensee of BCBSA and is licensed to use the "Blue Cross" and "Blue Shield" names and service marks in Michigan. BCBSM is not an agent of BCBSA and, by entering into this Contract, Group agrees that it made this Contract based solely on its relationship with BCBSM or its agents. Group further agrees that BCBSA is not a party to, nor has any obligations under this Contract, and that no obligations of BCBSA are created or implied by this language.

C.    **Notices.**

Unless otherwise provided in this Contract, any notice required shall be given in writing and sent to the other party either by hand-delivery, electronic mail message to designated representative of the other party, or postage pre-paid US first class mail at the following address or such other address as a party may designate from time to time.

If to Group:                                   If to BCBSM:

Current address shown on              Blue Cross and Blue Shield of Michigan
BCBSM Group Header                     National Account Administration, MC B564
                                                    600 Lafayette East
                                                    Detroit, Michigan 48226-2998

D.    **Bankruptcy or Insolvency.**

Neither BCBSM nor any other BCBS Plan shall have any obligation to continue paying Claims in the event of Group's bankruptcy or other insolvency. BCBSM, in its sole discretion, may continue paying Claims in such instance.

E.    **Inclusion of Subsidiary Companies.**

This section applies when a Subsidiary Company has a separate underwritten (not administrative service only) contract with BCBSM, and the following two conditions are met.

1. Group enrolls at least 20 percent of any Subsidiary Company's BCBSM membership in Group's Health Care Plan; and
2. The Subsidiary Company's health care plan with BCBSM is either terminated or, if it had been experience rated, it no longer meets BCBSM's minimum size for experience rated groups.

When these conditions are met, Group shall be liable for any financial account balances of Subsidiary Company's contract with BCBSM. Any Subsidiary Company account balance, including any premium liability or rate stabilization reserve, shall be transferred to Group. Any amount in such accounts owed by BCBSM to the Subsidiary Company shall be paid by BCBSM to Group, and any amounts owed by the Subsidiary Company to BCBSM shall be paid by Group to BCBSM. This will include rate stabilization reserve balances which would not be considered a collectable debt if the Subsidiary Company had terminated its contract with BCBSM without transferring the membership to Group's Health Care Plan. BCBSM shall determine a schedule for the payment of such transferred balances that shall not exceed two years.

F. **Amendment.**

Unless otherwise set forth in this Contract, this Contract may be amended only by a written agreement duly executed by authorized representatives of each party.

G. **Severability.**

The invalidity or nonenforceability of any provision of this Contract shall not affect the validity or enforceability of any other provision of this Contract.

H. **Waiver.**

The waiver by a party of any breach of this Contract by the other party shall not constitute a waiver as to any subsequent breach.

I. **Law.**

This Contract is entered into in the State of Michigan and, unless preempted by federal law, shall be construed according to the laws of Michigan.

J. **HIPAA.**

1. Group Certification.

   Group certifies that it is the Health Care Plan sponsor, performs Health Care Plan administration functions, needs access to Enrollee protected health information to carry out such administration functions, and has amended the Health Care Plan documents to comply with the requirements of 45 CFR 164.504(f)(2). BCBSM is therefore authorized to provide Group with the minimum necessary Enrollee protected health information for Group to perform its plan administration functions.

2. Business Associate Agreement.

   The parties shall enter into a business associate agreement as set forth in Schedule C.

K. **New York Surcharge.**

New York imposes two separate surcharges that impact the cost of health care in New York - the "graduate medical education" ("GME") surcharge (also known as the "professional education pool" surcharge) and the "uncompensated care surcharge." The GME surcharge is imposed to fund graduate medical education and only applies to inpatient, non-Medicare hospital services. The uncompensated care surcharge is for

indigent care, and, subject to certain exceptions, it applies to services, including outpatient, emergency and ambulatory surgery services, received in the State of New York from designated health care providers -- hospitals, diagnostic treatment centers, and freestanding clinical laboratories, regardless of the state in which the person lives.

The amount of the GME surcharge varies among eight regions in New York with the lowest in the Utica region and the highest in the New York City region, but a group can elect to pay the surcharge directly to the State resulting in a flat fee per resident or per family again varying by region. The amount of the uncompensated care surcharge is an additional 32.85% (subject to change by New York) of the provider's charge unless an election is made to pay the State directly, in which case the surcharge is reduced to 8.85%.

The New York Blue Cross Blue Shield Plans ("NYBCBS Plans") and the New York Health Department have agreed to allow the NYBCBS Plans to file timely elections permitting them to pay the surcharges directly on behalf of all organizations that are licensed by BCBSA. BCBSM shall, through the NYBCBS Plans, pay both (i) the GME surcharge by reporting the number of Enrollees who are New York residents and submit it with the covered lives assessment directly to the Empire NY BCBS Plan which then submits that to the State of New York and (ii) the uncompensated care surcharge at the 8.85% level for services provided to Enrollees in New York that are submitted and processed through NASCO or the BlueCard program.

Group and its Health Care Plan, consistent with Sections 2807-j.5 to 2807-t.3 of New York's Public Health Law, shall submit when required by the law, the information regarding specific payment amounts to New York providers and enrollment in New York; certify the data submitted to the State of New York and allow the New York State Commissioner of Health access to the data for verification purposes; and submit to the jurisdiction of the state of New York to maintain an action to enforce the provisions of the new law related to payment of the assessments. Such consent only applies to Claims paid through the New York Blue Cross Blue Shield Plans via NASCO or BlueCard.

**BCBSM:**

**GROUP:**

On behalf of the companies set forth on
Schedule E, as amended from time to time.

| By: _Dianne Malmgren_ (Signature) | By: _Kurt Vaaler_ (Signature) |
|---|---|
| Name: _Dianne Malmgren_ (Print) | Name: (Print) Kurt L. Vaaler |
| Title: _Account Manager_ | Title: Vice President Finance |
| Date: _5/10/05_ | Date: May 9, 2005 |

| By: _(signature)_ (Signature) | By: (Signature) |
|---|---|
| Name: (Print) _Marilyn J. Smith_ | Name: (Print) |
| Title: _Manage - Underwrit_ | Title: |
| Date: _5/10/05_ | Date: |

ANU:\CONTRACT\ASC\Weekly call-in
REV 1/18/2005

14

## BUSINESS ASSOCIATE ADDENDUM

This Business Associate Addendum ("Addendum") is effective upon execution, and amends and is made a part of that Administrative Services Contract ("ASC") between Blue Cross Blue Shield of Michigan ("BCBSM"), L & W Engineering Company ("Group"), on behalf of itself and as plan sponsor of the L & W Engineering Company Group Health Plan ("GHP"). All capitalized terms in this Addendum that are not defined by this Addendum will have the meaning ascribed to those terms by 45 Code of Federal Regulations ("CFR") 160-164, as may be amended from time to time.

WITNESSETH AS FOLLOWS:

WHEREAS, Group has established and maintains GHP as an employee welfare benefit plan as defined by Section 3(1) of the Employee Retirement Income Security Act of 1974 ("ERISA") for eligible employees and their dependents ("Enrollees"); and

WHEREAS, Group, GHP and BCBSM mutually agree to modify the ASC to incorporate the provisions of this Addendum to comply with applicable requirements of the Administrative Simplification provisions of Title II, Subtitle F of the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations codified at 45 CFR 160-164 (collectively, "HIPAA"), and to include additional provisions that Group, GHP, and BCBSM desire to have as part of the ASC.

NOW, THEREFORE, in consideration of these premises and the mutual promises and agreements hereinafter set forth, Group, GHP and BCBSM hereby agree as follows.

### PART 1—BCBSM's RESPONSIBILITIES

I. **SERVICES PROVIDED BY BCBSM**

During the continuance of the ASC, BCBSM will manage, operate and administer Coverage(s) and perform the services set forth in the attached Exhibit 1 with respect to benefits provided to Enrollees under GHP.

II. **PRIVACY OF PROTECTED HEALTH INFORMATION**

A. **Preservation of Privacy**

BCBSM will keep confidential all Protected Health Information that BCBSM creates or receives for, on behalf of, or from GHP in the performance of its duties under the ASC and this Addendum ("Enrollee Protected Health Information"). Except as permitted or required by this Addendum for BCBSM to perform its duties under the ASC, BCBSM will not use or disclose Enrollee Protected Health Information without the authorization of the Enrollee who is the subject of such Protected Health Information or as Required by Law.

B. **Prohibition on Non-Permitted Use or Disclosure**

BCBSM will neither use nor disclose Enrollee Protected Health Information (including any of Enrollee Protected Health Information that BCBSM may receive from a GHP Business Associate) except (1) as permitted or required by this Addendum, (2) as permitted or required in writing by GHP, (3) as authorized by Enrollees, or (4) as Required by Law.

C.  **Permitted Uses and Disclosures**

BCBSM will be permitted to use or disclose Enrollee Protected Health Information only as follows:

1.  **Functions and Activities on GHP's Behalf**

BCBSM will be permitted to use and disclose Enrollee Protected Health Information (a) for the management, operation, and administration of Coverage(s) as defined in the ASC that GHP offers Enrollees, and (b) for the services set forth in the ASC and the attached Exhibit A, which include Payment activities, Health Care Operations, and Data Aggregation.

2.  **BCBSM's Own Management and Administration**

    a.  **Protected Health Information Use**

    BCBSM will be permitted to use Enrollee Protected Health Information as necessary for BCBSM's proper management and administration or to carry out BCBSM's legal responsibilities.

    b.  **Protected Health Information Disclosure**

    BCBSM will be permitted to disclose Enrollee Protected Health Information as necessary for BCBSM's proper management and administration or to carry out BCBSM's legal responsibilities only (i) if the disclosure is Required by Law, or (ii) if before the disclosure, BCBSM obtains from the entity to which the disclosure is to be made reasonable assurance, evidenced by written contract, that the entity will (x) hold Enrollee Protected Health Information in confidence, (y) use or further disclose Enrollee Protected Health Information only for the purposes for which BCBSM disclosed it to the entity or as Required by Law; and (z) notify BCBSM of any instance of which the entity becomes aware in which the confidentiality of any of Enrollee Protected Health Information was breached.

3.  **Creation of Limited Data Sets and De-Identified Health Information**

BCBSM may use Enrollee Protected Health Information to create Limited Data Sets, in conformance with 45 CFR 164.514(e)(2), and De-Identified Health Information, in conformance with 45 CFR 164.514(b). The Limited Data Sets that BCBSM may create include a Limited Data Set containing the minimum necessary amount of Enrollee Protected Health Information that BCBSM reasonably needs for any Research or Health Care Operation in which BCBSM engages, as specified in Section II.C.5.a below.

4.  **Use and Disclosure of Limited Data Sets and De-Identified Health Information**

BCBSM may use and disclose De-Identified Health Information for any purpose, including after any cancellation, termination, expiration, or other conclusion of the ASC. Except as allowed under Section II.C.5 below, BCBSM may use and disclose a Limited Data Set only as permitted in writing by GHP.

5.  **Data Use Agreement—BCBSM's Permitted Use and Disclosure of Limited Data Set**

BCBSM may use and disclose a Limited Data Set that BCBSM created in conformance with Section II.C.3 above for BCBSM's Research or Health Care Operations, provided that BCBSM complies with the obligations of Sections II.C.5.a through e below. BCBSM may make such use and disclosure of the Limited Data Set after any cancellation, termination, expiration, or other conclusion of the ASC, unless the ASC is terminated by GHP pursuant to Section II.J below because of BCBSM's breach of privacy obligations

under this Addendum. BCBSM will not be allowed to use or disclose a Limited Data Set, as provided by this Section II.C.5, if the ASC is terminated by GHP pursuant to Section II.J below

### a.    Limitation on Permitted Uses and Disclosures

BCBSM will limit the uses and disclosures it makes of the Limited Data Set to Research or Health Care Operations, such as:

i.    Business planning and development such as conducting cost-management and planning-related analysis related to managing and operating BCBSM

ii.    Formulary development and administration, development and improvement of methods of payment or coverage policies

iii.    Customer service, including the provision of data analysis for policyholders, plan sponsors, or other customers, provided that protected health information is not disclosed

### b.    Prohibition on Unauthorized Use and Disclosure

BCBSM will neither use nor disclose the Limited Data Set for any purpose other than as permitted by Section II.C.5.a above, as otherwise permitted in writing by GHP, or as Required by Law. BCBSM will never use or disclose the Limited Data Set in a manner that would violate the HIPAA Privacy Rule, 45 CFR Part 164, Subpart E, if done by GHP.

### c.    Permitted Recipients

BCBSM, its affiliates, business associates, subcontractors and agents, and other GHP business associates will be permitted to receive and use the Limited Data Set, provided that they agree to the same restrictions and conditions that apply to BCBSM's use and disclosure of the Limited Data Set pursuant to this Section II.C.5.

### d.    Information Safeguards

BCBSM will adopt and use appropriate administrative, physical, and technical safeguards to preserve the integrity and confidentiality of the Limited Data Set and to prevent its use or disclosure other than as permitted by this Section II.C.5 or as Required by Law.

### e.    Reporting Non-Permitted Use or Disclosure

BCBSM will report to GHP any use or disclosure of the Limited Data Set not permitted by this Section II.C.5 or in writing by GHP. BCBSM will make the report to GHP not more than ten (10) days after BCBSM learns of such non-permitted use or disclosure.

## D.    Minimum Necessary

BCBSM will, in the performance of its functions and activities on GHP's behalf under the ASC and this Addendum, make reasonable efforts to use, to disclose, or to request of a Covered Entity only the minimum necessary amount of Protected Health Information to accomplish the intended purpose of the use, the disclosure, or the request.

## E.    Disclosure to GHP and GHP Business Associates

Other than disclosures permitted by Section II.C above, BCBSM will not disclose Enrollee Protected Health Information to GHP or to a GHP Business Associate, except as directed by GHP in writing.

## F.    Disclosure to BCBSM's Subcontractors and Agents

BCBSM will require each subcontractor and agent to which BCBSM may disclose Enrollee Protected Health Information to provide reasonable assurance, as evidenced by a written contract, that such subcontractor or agent will comply with the same privacy and security obligations with respect to Enrollee Protected Health Information as this Addendum applies to BCBSM.

## G.    Disclosure to Group

BCBSM will not disclose any Enrollee Protected Health Information to Group, except as permitted by and in accordance with Part 3 below.

## H.    Reporting Non-Permitted Use or Disclosure

BCBSM will report to GHP any use or disclosure of Enrollee Protected Health Information not permitted by this Addendum or in writing by GHP. BCBSM will make the report to GHP not more than ten (10) days after BCBSM learns of such non-permitted use or disclosure.

## I.    Duty to Mitigate

BCBSM will mitigate to the extent practicable any harmful effect of which BCBSM is aware that is caused by any use or disclosure of Enrollee Protected Health Information in violation of this Addendum.

## J.    Termination for Breach of Privacy Obligations

GHP will have the right to terminate the ASC if BCBSM has engaged in a pattern of activity or practice that constitutes a material breach or violation of BCBSM's obligations regarding Enrollee Protected Health Information under this Addendum and, on notice of such material breach or violation from GHP, fails to take reasonable steps to cure the breach or end the violation. If BCBSM fails to cure the material breach or end the violation within thirty (30) days after receipt of GHP's notice, GHP may terminate the ASC by providing BCBSM written notice of termination, stating the uncured material breach or violation that provides the basis for the termination and specifying the effective date of the termination.

## K.    Disposition of Protected Health Information

### 1.    Return or Destruction Upon ASC End

Except with respect to a Limited Data Set as specified in Section II.C.5 above, BCBSM will if feasible return to GHP or destroy, upon cancellation, termination, expiration, or other conclusion of the ASC, all of Enrollee Protected Health Information in whatever form or medium (including electronic medium) in BCBSM's custody or control (or in the custody or control of any subcontractor or agent to which BCBSM disclosed Enrollee Protected Health Information under Sections II.C.2.b or II.F above), including all copies of and any data or compilations derived from Enrollee Protected Health Information that allow identification of any present or past Enrollee who is a subject of the Protected Health Information. BCBSM will complete such return or destruction as promptly as practical, but not later than 120 days after the effective date of the cancellation, termination, expiration, or other conclusion of the ASC.

Group will reimburse BCBSM's reasonable cost incurred in returning or destroying such Protected Health Information.

Rev. January, 2004

2.  **Disposition When Return or Destruction Not Feasible**

BCBSM will identify for GHP any of Enrollee Protected Health Information that BCBSM cannot feasibly return to GHP or destroy upon cancellation, termination, expiration, or other conclusion of the ASC, and will describe the purposes that make the return to GHP or destruction infeasible. BCBSM will limit its further use or disclosure of this Protected Health Information after cancellation, termination, expiration, or other conclusion of the ASC to the purposes that make return to GHP or destruction infeasible.

III. **ACCESS, AMENDMENT, AND DISCLOSURE ACCOUNTING FOR PROTECTED HEALTH INFORMATION**

A. **Access**

BCBSM will make available to GHP or to the Enrollee (or the Enrollee's Personal Representative) for inspection and copying any of Enrollee Protected Health Information about the Enrollee that qualifies as part of a Designated Record Set, and that is not exempted from access by 45 CFR 164.524(a), that BCBSM has in its custody or control, so that GHP can meet its access obligations under 45 CFR 164.524. Any requests for access must be submitted on standard request forms available from BCBSM.

BCBSM may charge Group the Protected Health Information Access Fee set out in Section XII for each GHP request for access to Enrollee Protected Health Information that BCBSM fulfills.

B. **Amendment**

After BCBSM's receipt of an Enrollee's or GHP's request in writing on BCBSM's form, BCBSM will amend the appropriate Enrollee Protected Health Information that qualifies as part of a Designated Record Set that BCBSM has in its custody or control, unless, in its sole discretion, BCBSM determines that amendment is not appropriate for the reasons that would be available to GHP under 45 CFR § 164.526. BCBSM will send Enrollee a written explanation of any denial.

If BCBSM accepts a request to amend Enrollee Protected Health Information, it will make reasonable efforts to inform others, including individuals Enrollee names, of the amendment. BCBSM will amend PHI or records in its Designated Record Set on receipt of notice from a Covered Entity from which such Enrollee Protected Health Information was obtained that the information from it has been amended.

C. **Disclosure Accounting**

So that GHP may meet its disclosure accounting obligations under 45 CFR 164.528, BCBSM will do the following:

1.  **Disclosure Tracking**

BCBSM will record each disclosure of Enrollee Protected Health Information, which is not excepted from disclosure accounting under Section III.C.2 below, that BCBSM makes to GHP or to a third party ("Accountable Disclosures"). BCBSM will record for each Accountable Disclosure (a) the disclosure date, (b) the name and (if known) address of the entity to whom BCBSM made the disclosure, (c) a brief description of Enrollee Protected Health Information disclosed, and (d) a brief statement of the purpose of the disclosure.

2.  **Exceptions from Disclosure Tracking**

BCBSM will not be required to record Disclosure Information or otherwise account for disclosures of Enrollee Protected Health Information that the ASC, this Addendum, or GHP in writing permits or requires (a) for Treatment activities, Payment activities, or Health Care Operations, (b) to the Enrollee who is the subject of Enrollee Protected Health Information or to that Enrollee's Personal Representative, (c) pursuant to an authorization by the Enrollee (or the Enrollee's Personal Representative), (d) to persons

involved in that Enrollee's health care or payment for health care as provided by 45 CFR 164.510, (e) in a Limited Data Set, or (f) for any disclosures that are incident to any of the disclosures that the ASC, this Addendum, or GHP in writing permits or requires BCBSM to make.

### 3. Disclosure Tracking Time Periods

BCBSM will have available for GHP the Disclosure Information required by Section III.C.1 above for the six (6) years immediately preceding the date of GHP's request for the Disclosure Information (except BCBSM will not be required to have Disclosure Information for disclosures occurring prior to April 14, 2003.

### 4. Provision of Disclosure Information

BCBSM will make available to GHP or to the Enrollee (or the Enrollee's Personal Representative) the Disclosure Information regarding the Enrollee, so that GHP can meet its disclosure accounting obligations under 45 CFR 164.528.

BCBSM may charge Group the Protected Health Information Disclosure Accounting Fee set out in Section XII for each GHP request for Disclosure Information that BCBSM fulfills. Any requests for a report of accounting must be submitted on standard request forms available from BCBSM.

### D. Restriction Requests

BCBSM will respond to all requests to restrict the use or disclosure of Enrollee Protected Health Information relating to an Enrollee, pursuant to 45 CFR 164.522(a), which may affect BCBSM. GHP will promptly notify BCBSM in writing of any request for restriction on the use or disclosure of Enrollee Protected Health Information that may affect BCBSM. Any restriction requests must be submitted on standard request forms available from BCBSM. BCBSM will generally not agree to restriction requests. If BCBSM does agree, BCBSM will comply with the restriction until it is terminated by the individual or by us.

### E. Confidential Communications

BCBSM will accommodate an Enrollee's request for confidential communications (the use of reasonable alternative means or alternative locations when communicating Enrollee Protected Health Information) if the Enrollee provides a clear statement that all or part of the Enrollee Protected Health Information could endanger the Enrollee if not communicated by the alternative means or at the alternative location. Such requests must be submitted to BCBSM in writing on the form it provides.

## IV. SAFEGUARD OF PROTECTED HEALTH INFORMATION

BCBSM will maintain reasonable and appropriate administrative, physical, and technical safeguards, in accordance with the requirements of Social Security Act 1173(d) and 45 CFR 164.530(c), to protect against reasonably anticipated threats or hazards to and to ensure the security and integrity of Enrollee Protected Health Information, to protect against reasonably anticipated unauthorized use or disclosure of Enrollee Protected Health Information, and to reasonably safeguard Enrollee Protected Health Information from any intentional or unintentional use or disclosure in violation of this Addendum.

## V. COMPLIANCE WITH STANDARD TRANSACTIONS

### A. BCBSM

BCBSM will comply with each applicable requirement for Standard Transactions established in 45 CFR 162 when conducting all or any part of a Standard Transaction electronically for, on behalf of, or with GHP.

B.   **BCBSM's Subcontractors and Agents**

BCBSM will require any of its subcontractors or agents to comply with each applicable requirement for Standard Transactions established in 45 CFR 162 when the subcontractor or agent conducts all or any part of a Standard Transaction electronically for, on behalf of, or with GHP.

## VI.   INSPECTION OF BOOKS AND RECORDS

BCBSM will make its internal practices, books, and records relating to its use and disclosure of Enrollee Protected Health Information available and to the U.S. Department of Health and Human Services to determine GHP's compliance with 45 CFR 160-164.

### PART 2—GROUP HEALTH PLAN

## VII.   GHP AS COVERED ENTITY

Group and GHP acknowledge that GHP is an employee welfare benefit plan as defined in ERISA § 3(1), is subject to ERISA pursuant to ERISA § 4(a) and is therefore subject to HIPAA's Administrative Simplification provisions and implementing regulations as a Covered Entity that performs the Covered Functions of a Health Plan. Group and GHP represent and warrant that GHP has written documentation ("Plan Document") that informs Enrollees of the benefits to which they are entitled from GHP and describes the procedures for (A) establishing and carrying out funding of the benefits to which Enrollees are entitled under GHP's Plan Document, (B) allocating and delegating responsibility for GHP's operation and administration under the Plan Document, and (C) amending the Plan Document. Group and GHP further represent and warrant that GHP's Plan Document provides for the allocation and delegation of the responsibilities assigned to BCBSM under the ASC.

### PART 3—GROUP'S RESPONSIBILITIES

## VIII.   GROUP'S OBLIGATIONS

### A.   Group to Control GHP

Group retains full and final authority and responsibility for GHP and its operation. BCBSM is empowered to act on behalf of GHP only as stated in the ASC, this Addendum, or as mutually agreed in writing by Group, GHP, and BCBSM.

Group will have the sole responsibility for and will bear the entire cost of compliance with all federal, state, and local laws, rules, and regulations, including any licensing, filing, reporting, and disclosure requirement, that may apply to GHP. BCBSM will have no responsibility for or liability with respect to GHP's compliance or non-compliance with any applicable federal, state, or local law, rule, or regulation.

### B.   Underwriting and Benefits Determinations

BCBSM does not insure or underwrite the liability of Group or GHP, and has no responsibility for or discretion with respect to determining the benefits provided by GHP. Group retains the ultimate responsibility for the benefits provided by and for the Claims under GHP and for all expenses incident to GHP, except as BCBSM has specifically undertaken in the ASC.

## IX.   DATA EXCHANGE BETWEEN GROUP AND BCBSM

BCBSM may disclose to Group the minimum necessary information regarding whether an individual is an Enrollee participating in GHP or enrolled in GHP. If Group electronically exchanges data with BCBSM regarding the enrollment of Enrollees in GHP, health plan premium payments, and other matters

Rev. January, 2004

governed by HIPAA, Group will be required to meet the requirements of HIPAA and BCBSM's payer-specific instructions.

## X.    SUMMARY HEALTH INFORMATION

Upon Group's written request for the purpose either (a) to obtain premium bids for providing health insurance coverage for GHP, or (b) to modify, amend, or terminate GHP, BCBSM will provide Summary Health Information regarding the Enrollees participating in GHP to Group.

## XI.   GROUP'S PERFORMANCE OF
## PLAN ADMINISTRATION FUNCTIONS

### A.    Group's Certification

Group certifies that Group has amended GHP's Plan Document to incorporate the provisions required by 45 CFR 164.504(f)(2), as set out in Section XI.B below, and agrees to comply with GHP's Plan Document as amended. GHP therefore authorizes BCBSM to disclose the information Group has requested and certifies to BCBSM that such information is the minimum necessary Enrollee Protected Health Information for Group to perform the plan administration functions required of it as described in GHP's Plan Document. If Group requests "summary health information" as defined in 45 CFR 164.504(a), Group certifies to BCBSM that it is for a purpose as described in 45 CFR § 164.504(f)(1)(ii). BCBSM may rely on Group's certifications in this Agreement and on GHP's authorization that Group has provided the requisite certification, and will have no obligation to verify (1) that GHP's Plan Document has been amended to comply with the requirements of 45 CFR § 164.504(f)(2) or this Section XI, or (2) that Group is complying with GHP's Plan Document as amended.

### B.    GHP's Plan Document Amendment

Before GHP will authorize BCBSM to disclose the minimum necessary of Enrollee Protected Health Information to Group for any plan administration function that Group performs for GHP, GHP will ensure that its Plan Document (1) establishes the uses and disclosures of Enrollee Protected Health Information consistent with the requirements of 45 CFR 164 that Group will be permitted and required to make for the plan administration functions Group will perform for GHP, and (2) obligates Group to:

    1.      Neither use nor further disclose Enrollee Protected Health Information, except as permitted or required by GHP's Plan Document or as Required by Law.

    2.      Neither use nor disclose Enrollee Protected Health Information for any employment-related action or decision, or in connection with any other benefit or employee benefit plan of Group.

    3.      Ensure adequate separation between Group and GHP by (a) describing those employees or classes of employees or other persons under Group's control who will be given access to Enrollee Protected Health Information to perform plan administration functions for GHP, (b) restricting the access to and use of Enrollee Protected Health Information by such employees or other persons to the plan administration functions that Group will perform for GHP, and (c) instituting an effective mechanism for resolving any noncompliance with GHP's Plan Document by such employees or other persons.

    4.      Ensure that any subcontractor or agent to which Group provides Enrollee Protected Health Information agrees to the restrictions and conditions of GHP's Plan Document with respect to Enrollee Protected Health Information.

    5.      Report to GHP any use or disclosure of Enrollee Protected Health Information of which Group becomes aware that is inconsistent with the uses and disclosures allowed by GHP's Plan Document.

6.     Make Enrollee Protected Health Information available to GHP or to the Enrollee who is the subject of Enrollee Protected Health Information (or the Enrollee's Personal Representative) so that GHP can meet its access obligations under 45 CFR 164.524.

7.     Make Enrollee Protected Health Information available to GHP for amendment and, on notice from GHP, amend Enrollee Protected Health Information, so that GHP can meet its amendment obligations under 45 CFR 164.526.

8.     Record Disclosure Information as specified in Section III.C.1 above for each disclosure that Group makes of Enrollee Protected Health Information that is not excepted from disclosure accounting as specified in Section III.C.2 above and provide that Disclosure Information to GHP on request so that GHP can meet its disclosure accounting obligations under 45 CFR 164.528.

9.     Make its internal practices, books, and records relating to its use and disclosure of Enrollee Protected Health Information available to GHP and to the U.S. Department of Health and Human Services to determine GHP's compliance with 45 CFR 160-164.

10.    Return to GHP or destroy if feasible all of Enrollee Protected Health Information in whatever form or medium (including electronic medium) that Group received from GHP or BCBSM, including all copies of and any data or compilations derived from Enrollee Protected Health Information that allow identification of any present or past Enrollee who is the subject of Enrollee Protected Health Information, when Group no longer needs Enrollee Protected Health Information for the plan administration functions for which the Group received Enrollee Protected Health Information.  Group will limit the use or disclosure of any of Enrollee Protected Health Information that Group cannot feasibly return to GHP or destroy to the purposes that make its return to GHP or destruction infeasible.

## PART 4—BCBSM's COMPENSATION

## XII.    COMPENSATION TO BCBSM

For the services to Group, GHP and Enrollees under this Addendum, BCBSM reserves the right to charge Group (a) a reasonable Protected Health Information Access Fee for each request for access to a Enrollee's Protected Health Information that BCBSM fulfills pursuant to Section III.A above, plus a reasonable per page fee for each requested copy of such Protected Health Information that BCBSM provides and any postage expense that BCBSM incurs in delivering such Protected Health Information, and (b) a reasonable Protected Health Information Disclosure Accounting Fee for each request from GHP for Disclosure Information that BCBSM fulfills pursuant to Section III.C.4 above.  BCBSM will provide Group with a fee schedule should it exercise its right to charge such fees.

## PART 5—MISCELLANEOUS

## XIII.   ADDENDUM TERM

This Addendum will terminate immediately upon termination of the ASC by GHP pursuant to Section II.J above.  Otherwise, this Addendum will continue in full force and effect, notwithstanding termination of the ASC, until BCBSM has returned to GHP or destroyed all of Enrollee Protected Health Information, except only any Limited Data Set that BCBSM has pursuant to Section II.C.5 above, in accordance with Section II.K.1 above.

The obligations of Section II.C.5 above will, with respect to any Limited Data Set that BCBSM has pursuant to Section II.C.5 above, survive termination of this Addendum for as long as BCBSM maintains that Limited Data Set.

9

## XIV.   AUTOMATIC AMENDMENT TO CONFORM TO APPLICABLE LAW

Upon the compliance date of any final regulation or amendment to final regulations with respect to Protected Health Information, Standard Transactions, the security of Health Information, or other aspects of HIPAA applicable to this Addendum or to the ASC, this Addendum will automatically amend such that the obligations imposed on Group, GHP, and BCBSM remain in compliance with such regulations, unless BCBSM elects to terminate the ASC by providing Group and GHP notice of termination in accordance with the ASC at least thirty (30) days before the effective date of such final regulation or amendment to final regulations.

## XV.   CONFLICTS

The provisions of this Addendum will override and control any conflicting provision of the ASC. All non-conflicting provisions of the ASC will remain in full force and effect.

## XVI.   SURVIVAL OF PRIVACY OBLIGATIONS

BCBSM's obligations to preserve the privacy of Enrollee Protected Health Information as specified in this Addendum will survive cancellation, termination, expiration, or other conclusion of the ASC and this Addendum.

## XVII.   DEFINITIONS

All capitalized terms in this Addendum that are not defined by this Addendum will have the meaning ascribed to them by 45 CFR 160-164. The following terms have the following meanings when used in this Addendum:

A.    **"Claim"** means notification in a form acceptable to BCBSM that a health care service has been rendered or furnished to an Enrollee.

B.    **"Enrollee"** means "Enrollee," as defined in the ASC.

C.    **"Enrollee Protected Health Information"** means Protected Health Information that BCBSM creates or receives for, on behalf of, or from GHP (or from a GHP Business Associate) in the performance of BCBSM's duties under the ASC and this Addendum

D.    **"Plan Document"** means GHP's written documentation as described in Section VII above.

## SIGNATURES

BCBSM:                                      GROUP:

| By: *Dianne Malmgren* | By: *Kurt Vaaler* |
| (Signature) | (Signature) |
| Name: *Dianne Malmgren* | Name: Kurt L. Vaaler |
| (Print) | (Print) |
| Title: *Account Manager* | Title: Vice President Finance |
| Date: *5/10/05* | Date: May 9, 2005 |

| By: *MARILYN J. SMITH* | By: |
| (Signature) | (Signature) |
| Name: *MARILYN J. SMITH* | Name: |
| (Print) | (Print) |
| Title: *Manager - Underwriting* | Title: |
| Date: *5/10/05* | Date: |

## Exhibit 1 to Schedule C

BCBSM provides the following administrative services to Group:

- **ACTUARIAL AND STATISTICAL**

    Determining claims projections and pricing administrative services and stop-loss coverage.

- **CLAIMS ADJUDICATION**

    Examining Claims and determining payment levels, including data entry of Claims, maintenance of Claims experience files, use of medical consultants, review of utilization and reasonable and customary charges, and coordination of benefits (COB).

- **CLAIMS/MEMBERSHIP INQUIRIES**

    Handling inquiries—written, phone, or in-person—related to membership, benefits, Claims payment and Claims payment denial.

- **DATA AGGREGATION**

    Conducting data analyses for Health Care Operations using data that BCBSM created or received for, on behalf of, or from GHP and for, on behalf of, or from other Covered Entities for whom BCBSM acts as a Business Associate.

- **ENROLLMENT SERVICE**

    Preparing proposals and registering, coding, and preparing new applications.

- **FINANCIAL SERVICES**

    Performing financial functions, such as cash receipts, cash disbursements, payroll and general ledger processing, general accounting, preparation of financial statements, billing, group settlements, and wire transfers.

- **HEALTH CARE OPERATIONS**

    Conducting activities on behalf of GHP that relate to the functions of GHP that make it a Health Plan.

- **MEMBERSHIP FILE UPDATES**

    Maintaining membership status files and processing inter-plan transfers and contract conversions and changes, subject to conversion fees.

- **MEMBERSHIP VALIDATION**

    Verifying membership by wire, listing, CRT query, or other methods before or during adjudication.

- **OTHER SERVICES TO GHP**

    Contacting Group and Enrollees regarding adding, changing, or renewing coverage.

- **PAYMENT ACTIVITIES**

    Conducting activities relating to Claims payment and management, coverage determination, benefits provision and eligibility, risk adjustment, utilization review, medical necessity determination, and all related functions affecting obligations and amounts to pay for health benefits coverage.

- **PHARMACY BENEFITS MANAGEMENT**

    Providing or arranging (if Group elects to include pharmacy benefits in GHP) the provision of prescription drug management services, such as mail-order and network pharmacy dispensing, and disease and drug utilization management.

- **PROVIDER NETWORKS**

  Establishing, arranging, and maintaining provider networks, including managed care point-of-service, preferred provider, and traditional networks through contractual arrangements with preferred participating hospitals, physicians, and other health care providers and with other Health Plans within designated service areas.

- **RESEARCH**

  Systematically investigating, including research development, testing, and evaluation, in order to develop or contribute to generalizable knowledge.

- **STANDARD REPORTS**

  Generating monthly statements and Claim listings unless they contain PHI and Group has not provided the certification in Article XI of this Addendum.

- **STANDARD TRANSACTIONS AND**
  **OTHER ELECTRONIC DATA INTERCHANGE**

  Conducting health care administrative and financial transactions for which standards have been established in 45 CFR Part 162 as Standard Transactions, and engaging in such other electronic data interchange as necessary or appropriate to BCBSM's activities under the ASC.

# SCHEDULE D

## TO ADMINISTRATIVE SERVICES CONTRACT BETWEEN

### BLUE CROSS BLUE SHIELD OF MICHIGAN

### And

### L & W Engineering Company

## BlueCard

Like all Blue Cross and Blue Shield Licensees, BCBSM participates in a program called "BlueCard." Whenever Members access health care services outside the geographic area BCBSM serves, the claim for those services may be processed through BlueCard and presented to BCBSM for payment in conformity with network access rules of the BlueCard Policies then in effect ("Policies"). Under BlueCard, when Members receive covered health care services within the geographic area served by an on-site Blue Cross and/or Blue Shield Licensee ("Host Plan"), BCBSM will remain responsible to the Group for fulfilling BCBSM's contract obligations. However, the Host Plan will only be responsible, in accordance with applicable BlueCard Policies, if any, for providing such services as contracting with its participating providers and handling all interaction with its participating providers. The financial terms of BlueCard are described generally below.

## Liability Calculation Method Per Claim

The calculation of a Member's liability on claims for covered health care services incurred outside the geographic area BCBSM serves and processed through BlueCard will be based on the lower of the provider's billed charges or the negotiated price BCBSM pays the Host Plan.

The methods employed by a Host Plan to determine a negotiated price will vary among Host Plans based on the terms of each Host Plan's provider contracts. The negotiated price paid to a Host Plan by BCBSM on a claim for health care services processed through BlueCard may represent:

(i) the actual price paid on the claim by the Host Plan to the health care provider ("Actual Price"), or

(ii) an estimated price, determined by the Host Plan in accordance with BlueCard Policies, based on the Actual Price increased or reduced to reflect aggregate payments expected to result from settlements, withholds, any other contingent payment arrangements and non-claims transactions with all of the Host Plan's health care providers or one or more particular providers ("Estimated Price"), or

(iii) an average price, determined by the Host Plan in accordance with BlueCard Policies, based on a billed charges discount representing the Host Plan's average savings expected after settlements, withholds, any other contingent payment arrangements and non-claims transactions for all of its providers or for a specified group of providers ("Average Price"). An Average Price may result in greater variation to the Member and the Group from the Actual Price than would an Estimated Price.

Host Plans using either the Estimated Price or Average Price will, in accordance with BlueCard

Policies, prospectively increase or reduce the Estimated Price or Average Price to correct for over- or underestimation of past prices. However, the amount paid by the Member is a final price and will not be affected by such prospective adjustment.

Statutes in a small number of states may require a Host Plan either (1) to use a basis for calculating a Member's liability for covered health care services that does not reflect the entire savings realized, or expected to be realized, on a particular claim or (2) to add a surcharge. Should any state statutes mandate liability calculation methods that differ from the negotiated price methodology or require a surcharge, the Host Plan would then calculate a Member's liability for any covered health care services in accordance with the applicable state statute in effect at the time the Member received those services.

## Return of Overpayments

Under BlueCard, recoveries from a Host Plan or from participating providers of a Host Plan can arise in several ways, including but not limited, to anti-fraud and abuse audits, provider/hospital audits, credit balance audits, utilization review refunds, and unsolicited refunds. In some cases, the Host Plan will engage third parties to assist in discovery or collection of recovery amounts. The fees of such a third party are netted against the recovery. Recovery amounts, net of fees, if any, will be applied in accordance with applicable BlueCard Policies, which generally require correction on a claim-by-claim or prospective basis. Unless otherwise agreed to by the Host Plan, BCBSM may request adjustments from the Host Plan for full provider refunds due to the retroactive cancellation of membership only for one year after the Inter-Licensee financial settlement process date of the original claim. In some cases, recovery of claim payments associated with a retroactive cancellation may not be possible if the recovery conflicts with the Host Plan's state law or provider contracts or jeopardizes its relationship with its providers.

## BlueCard Fees and Compensation

The Group understands and agrees (1) to pay certain fees and compensation to BCBSM which it is obligated under BlueCard to pay to the Host Plan, to the Blue Cross and Blue Shield Association, or to the BlueCard vendors, unless BCBSM's contract obligations to the Group require those fees and compensation to be paid only by BCBSM and (2) that fees and compensation under BlueCard may be revised from time to time without the Group's prior approval in accordance with the standard procedures for revising fees and compensation under BlueCard. Some of these fees and compensation are charged each time a claims is processed through BlueCard and include but are not limited to, access fees, administrative expense allowance fees, Central Financial Agency Fees, and ITS Transactions Fees. Also, some of these claim-based fees, such as the access fees and the administrative expense allowance fee, may be passed on to the Group as an additional claims liability. Other fees include, but are not limited to, an 800 number fee and fee for providing PPO provider directories. However, Group will only be responsible for any access fees charged by a Host Plan.

## Schedule E

between Blue Cross Blue Shield of Michigan and L & W ENGINEERING COMPANY

L & W Engineering Company is liable for all payments for the following companies:

L & W ENGINEERING COMPANY
SOUTHTEC, LLC
JAYTEC, LLC
AXIS ENGINEERING
WILD BOAR HARLEY DAVIDSON
KRESTEC, LLC
CONTINENTAL, LTD.

| BCBSM: | | GROUP: | |
|---|---|---|---|
| By: | _(signature)_ | By: | _Kurt Vaaler (signature)_ |
| Name: Marilyn Smith, National Underwriting | | Name: Kurt L. Vaaler, Vice President Finance | |
| Date: 5/10/05 | | Date: May 9, 2005 | |
| By: _Dianne Malmgren (signature)_ | | By: | |
| Name: Dianne Malmgren, Sales Consultant | | Name: | |
| Date: 5/10/05 | | Date: | |